**No. 57048.**—American Express Company and Flanary Sausage Company *v.* United States, protest 173282–K (New York).

FORD, Judge: Sausage casings, imported at the port of New York, were classified by the collector as manufactures in chief value of rayon, not specially provided for, and duty was levied thereon at the rate of 27½ cents per pound, plus 35 per centum ad valorem, under the provisions of paragraph 1312 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802.

It is the principal claim of plaintiffs that said merchandise is properly dutiable at the rate of 15 per centum ad valorem under paragraph 41 of said act, as modified by the General Agreement on Tariffs and Trade, *supra*, as manufactures, wholly or in chief value of gelatin.

The evidence consists of the testimony of the manufacturer and exporter taken by deposition, a portion of which deposition is quoted as follows:

1. With what company are you associated and how long have you been associated with it?—A. The firm "Wilh. Sopp" is in existence since 1888. The founder was Wilhelm Sopp, my grandfather. In 1922 I entered the firm, and became a partner in the firm in 1936. Since 1945 I am the sole owner and manager of the firm.

2. What is your position and what are your duties?—A. I am the sole owner and manager of the firm.

\*       \*       \*       \*       \*       \*       \*

4. Are you familiar with the materials used, the cost of such materials and the processes employed in the production of sausage casings covered by Consular Invoice No. 01282, certified August 21, 1950, order exported August 29, 1950 from Germany and contained in cases No. 301–315?—A. Yes, I am familiar with the materials used, and cost of such materials and the processes employed in the production of sausage casings covered by consular invoice No. 01282.

5. How did you become familiar with the materials used, the cost of such materials and the processes employed in the production of the sausage casings mentioned in the preceding interrogatory?—A. I was informed by the textile engineer, employed in my firm, and the manager of the Kunstdarm GmbH. (Sausage Casings Ltd.).

6. What materials are used and what processes are employed in the production of the sausage casings mentioned in interrogatory No. 4?—A. The tubulars are woven on ribbon-looms seamless of rayon or natural silk. The impregnation raw-material consists mainly of buffel-split in either chalked condition or in a salty solution. The material has to coagulate in basins for at least three or four months. It must then be cleansed very carefully before it can be reduced to absolutely small pieces (various mechanical processes). Ultimately the material with an addition of soft chemicals brings about a thick emulsion which is the mass for the impregnation. The mass is then filled in the impregnating machines and after various further processes the sausage casings are impregnated, dried with blown hot air and afterwards smoked for conserving the coating. For sale the tubes have to be cut in the desired lengths and either sewn or bound with a string.

7. Are the records showing the cost of the several materials, the cost of processing said materials, the cost of overhead charges and the profit realized by your company, kept under your direct supervision?—A. Yes, the records are kept under my direct supervision.

Counsel for the defendant strenuously objects to the answers to interrogatories Nos. 5 to 7, inclusive, upon the ground that all of said answers are based upon hearsay, as disclosed by the answer of the witness to interrogatory No. 5. In this interrogatory, the witness was asked to state how he became familiar with

the materials used, the cost of such materials, and the processes employed in the production of the involved sausage casings, to which he replied:

I was informed by the textile engineer, employed in my firm, and the manager of the Kunstdarm GmbH.

It will be observed, however, that in interrogatory No. 7, the witness was asked if the records showing the cost of the several materials, the cost of overhead charges, and the profit realized by his company, were kept under his direct supervision, to which he replied: "Yes, the records are kept under my direct supervision."

If the answer of the witness to interrogatory No. 5 were the only qualification possessed by the witness for giving the answers to the other interrogatories objected to by counsel for the defendant, we would feel constrained to sustain the objections of counsel for the defendant and either deny the interrogatories and answers thereto admission in evidence, or to give to them no consideration or weight. However, the record shows that the exporting firm was founded by the grandfather of the witness in 1888; that the witness entered the firm in 1922, became a partner in the firm in 1936, and since 1945 has been the sole owner and manager of the firm.

In addition to the above, the witness testified, as hereinbefore set out, that the records showing the cost of the several materials, the cost of processing said materials, the cost of overhead charges, and the profit realized by his company, are kept under his direct supervision.

In view of the foregoing, it is our opinion that the witness was qualified to give the answers to the interrogatories which were objected to by counsel for the defendant. We therefore overrule all objections made to the answers to the interrogatories and deny all motions made to strike the same from this record.

It will be observed, as hereinbefore set out, that the witness in answer to interrogatory No. 6, stated in part as follows:

* * * The impregnation raw-material consists mainly of buffel-split in either chalked condition or in a salty solution. The material has to coagulate in basins for at least three or four months. It must then be cleansed very carefully before it can be reduced to absolutely small pieces * * *.

Up to the point covered by the above testimony, it is apparent that the impregnating solution was nothing more than raw gelatin, or rawhide gelatin. At least, its manufacture had not advanced to the point where it was suitable for use in impregnating the rayon tubulars. However, the witness then proceeds to detail further steps in the advancement of the material to the point where it is suitable for use in impregnating the rayon tubulars. He states that:

* * * Ultimately the material with an addition of soft chemicals brings about a thick emulsion which is the mass for the impregnation.

The evidence makes it clear that the soft chemicals were added to the impregnating material, raw gelatin, or rawhide gelatin, prior to the time when it had reached a stage in its manufacture where it was, in fact, gelatin suitable for use in impregnating the tubulars. Since the soft chemicals were one of the ingredients used in the production of gelatin, the actual cost of the soft chemicals is immaterial. The two materials which were united to form the sausage casings in issue were rayon tubulars and gelatin. We are not here concerned with the cost of the soft chemicals, or with the cost of any other elements which went to make up, or were used in the production of gelatin, except as these costs reflect the final cost of the gelatin, so long as the ultimate product which was produced was gelatin. Here, the soft chemicals were used in the production of gelatin and were not *per se* united with the rayon tubulars to make sausage casings.

The foregoing observations find support in the following quotation from *Turner & Co.* v. *United States*, 12 Ct. Cust. Appls. 48, T. D. 39997:

In determining the component material of chief value, it has been invariably held by unmistakable implication that where the manufacturer himself fabricates any one of the component materials in order to bring it to a condition ready for use in the article, the aggregate value of the original material plus the expenses of labor, etc., incurred in bringing it to its finished condition should be taken as "the value" of that material; * * *.

While the above quotation is from the syllabus or headnote in the case, it is, nevertheless, a true epitomization of the decision as a whole.

In interrogatory No. 8, the witness was asked to state:

For any convenient quantity of the sausage casings mentioned in Interrogatory No. 4 * * * please state the cost as shown by your records of the rawhide gelatine (including the cost of all materials, labor, and the appropriate share of the overhead expenses and profit) to bring them into condition ready to be united with the rayon webbing.

In view of the fact that the interrogatory refers to *rawhide gelatine*, it is quite apparent why the witness itemized the cost of the gelatine as follows:

| | |
|---|---|
| Cost of *rawhide gelatine* [italics supplied] | DM 5,47 p. 100 m. |
| Labor including a proportionate share of overhead expenses and profit as well as necessary chemicals and other ingredients: | 13,60 p. 100 m. |
| Total: | DM 19,07 p. 100 m. |

For the reasons heretofore stated, it is not material here that the interrogatory was worded as it was, or that the witness gave his answer as stated, since the necessary chemicals and other ingredients were used in the process of bringing the rawhide gelatin to that stage where nothing remained to be done to it except unite it with the rayon tubular.

The only question presented in this case is whether the component material of chief value of the involved merchandise is gelatin or rayon. On this point, the witness testified without contradiction that the cost, as shown by his records which were kept under his direct supervision, of the gelatin to bring it into condition ready to be united with the rayon webbing was "DM 19,07 p. 100 m." The witness also testified that the cost of the rayon webbing, as shown by his records, to bring it into condition ready to be joined with the gelatin portion, was "DM 17,45." This testimony establishes, in the absence of any showing to the contrary, that the component material of chief value of the involved merchandise is gelatin and not rayon. Gelatin and rayon webbing which has been united in the manner shown by this record, and thereby converted into sausage casings, is a manufacture within the meaning of that term as used in paragraph 41, as modified, *supra*, and since it is established that this manufacture is in chief value of gelatin, it answers all the requirements of said paragraph 41, as modified, *supra*, and is dutiable thereunder. *Midwest International Co.* v. *United States*, 6 Cust. Ct. 8, C. D. 412; *Shell Oil Company* v. *United States*, 27 C. C. P. A. (Customs) 94, C. A. D. 68; *Hartranft* v. *Wiegmann*, 121 U. S. 609, 30 L. ed. 1012; and *Anheuser-Busch* v. *United States*, 207 U. S. 556, 52 L. ed. 336.

In the latter case, the United States Supreme Court held that:

* * * Manufacture implies a change, but every change is not manufacture, and yet every change in an article is the result of treatment, labor and manipulation. But something more is necessary, as set forth and illustrated in *Hartranft* v. *Wiegmann*, 121 U. S. 609. There must be transformation; a new and different article must emerge, "having a distinctive name, character or use."

We therefore hold all of the merchandise covered by this protest to be properly dutiable at only 15 per centum ad valorem under paragraph 41 of the Tariff Act

of 1930, as modified by the General Agreement on Tariffs and Trade, *supra*, as alleged by the plaintiffs.

To the extent indicated the specified claim in this suit is sustained; in all other respects and as to all other merchandise all the claims are overruled. Judgment will be rendered accordingly: