(C.D. 4233)

JAMES LOUDON & CO., INC.
FIBERBOARD PAPER PRODUCTS ET AL. } *v.* UNITED STATES

United States Customs Court, First Division

(Decided June 15, 1971)

*Glad & Tuttle* (*George R. Tuttle, Jr.*, of counsel) for the plaintiffs.
*L. Patrick Gray, III*, Assistant Attorney General (*Arthur H. Steinberg, Dominick M. Minerva*, and *Bernard J. Babb*, trial attorneys), for the defendant.

Before Rao, Watson, and Maletz, Judges

Rao, Chief Judge: The merchandise covered by the protests at bar, consolidated for trial, consists of glass fiber mats, exported from Canada. It was classified under paragraph 1539(b) of the Tariff Act of 1930, as modified by T.D. 54108, at the rate of 21 cents per pound and 17 per centum ad valorem, as manufactures wholly or in chief value of any product of which synthetic resin, or resin-like substance is the chief binding agent.

Plaintiffs claim that the imported merchandise should have been classified under paragraph 230(d) of the Tariff Act of 1930, as modified by T.D. 54108, *supra*, at the rate of 21 per centum ad valorem as manufactures wholly or in chief value of glass, not specially provided for or, in the alternative, under paragraph 1402 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, at the rate of 5 per centum ad valorem as roofing felt.

The pertinent provisions of the tariff act, as modified, are as follows:

Paragraph 1539(b), as modified, *supra:*

| | |
|---|---|
| Manufactures wholly or in chief value of any product described in the preceding item 1539 (b), or of any other product of which any synthetic resin or resin-like substance is the chief binding agent_____ | 21¢ per lb. and 17% ad val. |

Paragraph 230(d) of the tariff act, as modified, *supra:*

| | |
|---|---|
| All glass, and manufactures of glass, or of which glass is the component material of chief value not specially provided for (* * *)_____ | 21% ad val. |

Paragraph 1402 of the tariff act, as modified, *supra:*

> Sheathing paper, roofing paper, deadening felt, sheathing felt, roofing felt or felt roofing, whether or not saturated or coated_____ 5% ad val.

The record consists of the testimony of three witnesses on behalf of the plaintiffs, and eleven exhibits. The latter will be specifically referred to as the determination of the issue in this case requires.

In a report of the United States Customs Laboratory, No. 3642, relative to the merchandise in entry 33646 (Fiberboard Paper Products), the following is stated:

> The sample is composed of uncolored glass fibers bound in place by a synthetic resin of the urea-formaldehyde type.
> The glass fibers appear to have been formed in layers, each layer having the fibers intermeshed, but the layers being more or less separate, one from the other.
> The glass fibers constitute 82% of the weight. The resin is the agent serving to bind the fibers in place.

In a further report of the United States Customs Laboratory, No. 62, relative to entry 33646, it is stated:

> The sample consists of uncolored glass fibers bound in place to form a sheet, being bound by synthetic resin of the urea-formaldehyde type.
> The resin constitutes 18% of the weight of the sample. In our opinion, the resin is acting as chief binding agent.

In United States Customs Laboratory report No. 2866, relative to the merchandise imported by Certain-Teed Products, it is stated:

> The sample is composed of glass fibers bound in place by a synthetic resin of the urea-formaldehyde type.
> The glass fibers appear to have been formed in layers—each layer having the fibers intermeshed, but the layers being more or less separate, one from the other.
> The glass fiber constitutes 82% of the weight.

Mr. Ben A. Wilson, director of engineering for the Fiberboard Corporation and importer of the merchandise covered in protest 65/13192, testified that while director of purchases during 1957 to 1963, his company had purchased glass mats for the purpose of manufacturing saturated roofing mats. He described the method of application by a roofer to transform a glass mat into a "saturated" roofing mat, by applying a hot layer of asphalt on the roof and then unrolling the glass mat into it, and mopping additional hot asphalt on top of it, building it up layer by layer. The witness further stated that the glass mats were not usable as roofing mats in their imported condition; that the product as imported cannot be used for roofing purposes

because it would not bond well with the roofing asphalt and because the mat would be too light to physically handle on a roof.

Plaintiffs' second witness was Mr. William A. Gough, traffic manager for 25 years and purchasing agent for 12 years for Certain-Teed Products Company, manufacturer of asphalt roofing products, and importer of the merchandise covered in protest 65/13193. He testified that he had on many occasions observed the manufacturing processes of glass mats purchased by his company, such as those similar to plaintiffs' exhibit 1, which after importation are run through a coating machine where they are coated with asphalt.

Mr. James Whitefield, comptroller of the Peace River Glass Fibers, Ltd., manufacturer of the imported glass fiber mats, testified that his duties consist of maintaining all accounting records of the company, including cost accounting records relative to the mats in question. The witness stated that in the performance of his duties, it was necessary for him to observe the manufacturing processes of his company's products and that, accordingly, he had observed the process of manufacture of glass matting such as that imported. He described the process substantially as follows:

> Glass fiber matting is made from glass rods. The raw materials for the glass rods are made into batches and put into the furnace for melting. The melting process takes 20 hours for it to become the proper consistency. The glass then flows onto a shaft from where it is drawn by a drawing machine. By the time it reaches the end of the drawing machine it has cooled somewhat and is then cut into six-foot lengths, then graded according to the diameters. The diameters range from four millimeters to five millimeters. The glass rods are then put in storage. When they are required for making the fiber matting they are fed into a fiber processing unit which remelts and redraws the product into fibers. The fibers which are drawn from the glass rods are deposited onto a moving conveyor belt. At this stage the fibers are just laying loose on the belt, completely unbounded. As the belt moves along the body of the mat builds up to the required thickness. At this point there are edge reinforcements introduced. These are sliver reinforcements. The whole assembly then goes through a dipping bath for saturation with the binding agents, then progresses along through the drying ovens and the curing ovens. As it emerges from the curing ovens it is wound into the rolls of the required length. That is the process. [R. 31–32.]

There was no evidence offered on behalf of the defendant tending to establish that the process of manufacture of the imported merchandise was otherwise than that described by plaintiffs' witness.

Mr. Whitefield further testified that the raw materials employed in the manufacture of the glass rods used in the manufacture of the Rx–3–B matting consist of silica sand, cyanide, soda ash, limestone,

borax, potassium carbonate, and magnesium oxide. After the glass rods are made, a second group of raw materials is introduced in the manufacture of the matting from the glass rods.

On cross-examination, plaintiffs' witness stated that the glass fibers drawn from the glass rods are piled on a conveyor belt and form a layer of fibers on the belt; that the layered effect of exhibit 3 (sample of the type Rx–3–B taken from the shipment in issue) is caused by the drying and curing process. He further testified that during the drying and curing process, there was a "migration" of the binding agent to the surface of the mat and that "[t]his tends to give the appearance of layers at times" (R. 83) and that one layer is not put on top of another at any time; that before the mat goes through the dipping bath it is known as a "green mat" but that the product is never sold or used in that form; and that there is not a manufactured product after the dipping process. The witness explained that the imported material would not hold together without the resin and that the resin permeates throughout the entire material (R. 86–87). No synthetic resin is used in the manufacture of the glass rods (R. 87). There is a continuous manufacturing process from the time that the fibers are discharged onto the belt until they are wound on the roll (R. 90).

Plaintiffs specifically contend that the imported glass fiber mats are not dutible under paragraph 1539(b), *supra*, as classified, since the importations are not manufactures of a product having a synthetic resin or resin-like substance as the chief binding agent, but that they are manufactures which contain synthetic resin and that, accordingly, they are excluded from classification under paragraph 1539(b). It is further maintained that based upon the cost figures which have been introduced in evidence, the matting is in chief value of the glass filaments and properly dutiable under paragraph 230(d) of the tariff act as a manufacture of glass.

In the above connection, defendant maintains that little or no weight should be given to the testimony of plaintiffs' witness, Whitefield, as there is no showing that he qualifies as one who is knowledgeable regarding how the imported merchandise was made. We deem this contention of the defendant without merit. The record discloses that plaintiffs' witness had observed the process of manufacture and the ultimate installation of the glass mat product. It further appears that from 1957 to 1963 he was director of purchases, raw material, supply and equipment for his corporation and had been manufacturing manager of the roofing division and had purchased a glass mat product similar to exhibit 1. It would accordingly appear that in such capacities, the witness was competent to testify as to the manner in which the imported product was produced and as to

what materials were used in the process, which knowledge was acquired in the regular course of his duties. The witness was not testifying as to any technical knowledge of the chemical or manufacturing process, but stating facts as to the materials used and as to the manner in which the components of the ultimate product were employed. Accordingly, the cases cited by the defendant on the subject of competency of a witness to testify have no bearing or relevancy to the situation in the case before us.

On the question as to what constitutes a manufacture of a product of which synthetic resin or a resin-like substance is the chief binding agent, both sides to the controversy direct our attention to the holding of the Court of Customs and Patent Appeals in *United States* v. *National Starch Products, Inc.*, 50 CCPA 1, C.A.D. 809 (1962). There, the merchandise consisted of 4' x 8' sheets of particle boards which had been made from chips, flakes or splinters of wood which were impregnated with a synthetic resin, pressed into sheets in a hot plate press, and then sanded and cut into the imported sheets. The merchandise was classified under paragraph 1402 of the Tariff Act of 1930 as "wallboard." The court in the *National Starch* case found that the "product" of which synthetic resin is the chief binding agent must have an independent commercial existence before it constitutes a "product" from which "manufactures wholly or in chief value" of such product can be made and that cutting and sanding the particle board did not constitute a "manufacture" of a "product" under the tariff act and relevant decisions. In denying a claim for classification of the merchandise under paragraph 1539(b), *supra*, as manufactures wholly or in chief value of a product of which any synthetic resin or resin-like substance is the chief binding agent, the court, at page 6, stated:

> * * * If, therefore, the "product" were the cut and sanded 4' x 8' sheets of particle board *as imported*, then the imported merchandise cannot logically also be a "manufacture" of that "product", since the "manufacture" and the "product" are identical. A contrary interpretation would render meaningless the words "product" and "manufactures" in paragraph 1539(b).
>
> * * * * * * *
>
> These cases as well as numerous others require that to be a "manufacture of," there must be a transformation of the starting material into a new article of commerce. "There must be transformation; a new and different article must emerge, 'having a distinctive name, character or use.'" *Anheuser-Busch Brewing Ass'n.* v. *United States*, 207 U.S. 556, 562.
>
> Upon reconsideration we hold that the imported 4' x 8' panels of finished particle board on which the protest was filed cannot logically be both a "*manufactures*" *of and* the "product" from which the "manufactures" are made as contemplated by paragraph

1539(b). Under the applicable authorities we find that sanding and cutting *unfinished* particle board, after it comes from the hot press, do not transform it into "manufactures" of that "product" as contemplated by paragraph 1539(b). [Italics quoted.]

In *United States* v. *J. E. Bernard & Co., Inc.*, 42 CCPA 69, C.A.D. 573 (1954), classification of the merchandise under paragraph 1539(b), *supra*, was upheld because there was evidence to prove that a product of synthetic resin which served as a chief binding agent pre-existed the involved washing machine agitators made therefrom as a molding compound.

In our opinion, the glass fiber matting involved in this case is identical to the particle board in the *National Starch* case, *supra*, in that it is not manufactured in any way after being treated with the synthetic resin or resin-like chief binding agent. The process described in the record indicates that fibrous glass matting is made from glass rods. The glass rods are fed into a fiber processing unit which remelts and redraws the product into fibers. The fibers are deposited on to a moving conveyor belt, at which stage the fibers are lying loose on the belt, completely unbound. As the belt moves along, the body of the mat builds up to the required thickness. After the introduction of sliver edge reinforcements, the whole assembly then goes through a dipping bath for saturation with the binding agents, then progresses through drying and curing ovens, after which it is wound into rolls of required length. During the drying and curing process, there is a migration of the binding agent to the surface of the mat. We are of the opinion that the glass fiber matting, like the particle board involved in the *National Starch* case, is a "product" of which synthetic resin or resin-like material is the chief binding agent and that it is not a "manufacture wholly or in chief value" of such "product." The only processing that is done to the glass mat, i.e. the "product," is the trimming of the edge at each side of the mat for shipping purposes, a factor which does not transform the glass mattings into "manufactures" of the "product." Accordingly, we conclude that the involved glass fiber matting is not properly dutiable under paragraph 1539(b) as manufactures wholly or in chief value of any product of which any synthetic resin or resin-like substance is the chief binding agent.

As indicated, plaintiffs claim that the glass fiber matting is properly dutiable under paragraph 230(d) of the Tariff Act of 1930, as modified, at the rate of 21 per centum ad valorem as manufactures wholly or in chief value of glass, not specially provided for.

To determine the component material of chief value of an article, the cost of the separate components to the manufacturer at the time they are ready to be assembled or combined into the article, must be established. *United States* v. *Jovita Perez et al.*, 44 CCPA 35, C.A.D. 633

(1957). The relative values of the component materials of chief value of the importations at bar are to be determined when the glass fibers have been produced and are ready to be dipped into the bath to apply the synthetic resin binding agent. Accordingly, the value of the glass fibers includes the cost and overhead production of the glass rods and the fibers from the rods. In this connection, we note the case of *Swiss Manufactures Association, Inc., Rohner, Gehrig & Co., Inc., et al.* v. *United States*, 39 Cust. Ct. 227, C.D. 1933 (1957), wherein the court, at page 233, stated:

> * * * The law is well settled that the costs entering into bringing the materials to the state where they are ready to be united with the other materials in the manufacture of the articles are attributable to the *materials* and are to be considered in the determination of component material of chief value, * * *. *Turner & Co. et al.* v. *United States*, 12 Ct. Cust. Appls. 48, T.D. 39997; *C. H. Powell Co. et al* v. *United States*, 64 Treas. Dec. 467, T.D. 46711. [Italics quoted.]

As heretofore indicated, Mr. Whitefield was responsible for maintaining the accounting records including cost accounting records of his company, and had also observed the process of manufacture of the glass mats. Accordingly, the witness was competent to testify concerning cost factors predicated upon the records of the company. *American Express Company et al.* v. *United States*, 30 Cust. Ct. 333, Abstract 57048 (1953).

Mr. Whitefield testified that plaintiffs' exhibit 7 was a copy of a ledger maintained under his direct supervision, containing cost figures of the various raw materials used in the production of the involved mats, taken from suppliers' invoices and production reports (R. 57). Exhibit 8 sets forth the materials and their costs per unit of 100 square feet used in the manufacture of the Rx–3–B mat, the results being obtained from exhibit 7 (R. 62–64). The cost of the glass raw materials used is $0.0245 and the cost for the "sliver" is $0.0008. The conversion costs for fabricating the glass rods is $0.0784 and that for the sliver is $0.0101. These costs total $0.1138. On the other hand, the cost shown in exhibit 8 for the synthetic resin materials, consisting of urea formaldehyde, polyvinylacetate, dextrine, chromium sulfate and lanolubric totals $0.0644 (stated as $0.0635). Accordingly, it appears from exhibit 8 that the cost of the materials to produce the glass rods, including the conversion costs, exceeds in value the cost of the synthetic resin materials subsequently employed in the ultimate production of the type Rx–3–B mat indicated in said exhibit.

Plaintiffs' witness identified exhibit 9 as containing the manufacturing costs per roll (120 square feet) for the mats in question, stating that they were computed from plaintiffs' exhibit 8. The cost figures

for the glass raw materials are stated in exhibit 9 as $2.94 for the Rx–3–B mat, $3.26 for the Rx–2–B mat, and $3.58 for the Rx–1–B mat.

Mr. Whitefield further testified that the percentage of overhead allocatable to manufacturing or converting the glass rods into fibers would be 55–60 percent of the total overhead costs shown on exhibits 8 and 9; that from exhibit 9, the cost of overhead would be 55–60 percent of a total of $29.74 (stated as $29.73) or approximately $17.84, making a grand total for the glass materials including overhead for the Rx–3–B mat of approximately $20.78; that the cost of the overhead for the Rx–2–B mat would be 55 percent of $33.04 (stated as $33.05) or $18.17 for a total cost of the glass materials including conversion costs of $21.43; that the cost of the overhead for the Rx–1–B mat would be 55 percent of $36.34 (stated as $36.32) or $19.98 which including the glass raw materials would total $23.56, all figures in Canadian dollars (R. 114).

Plaintiffs' exhibit 9 further discloses that the costs of the materials, urea formaldehyde, polyvinylacetate, dextrine, chromium, and lanolubric in the production of the three types of mats are given as $7.62, $8.47, and $9.32, respectively. The cost of the slivers is stated as 10¢ in each case. The above figures indicate that the cost of the glass raw materials together with the overhead expenses incurred in converting the glass fibers from the rods exceeds the cost of the synthetic resin materials used in the production of the mats and establish, in our opinion, that the component material in chief value in the imported mats is glass.

Plaintiffs' witness identified exhibit 10 as consisting of photocopies of the cost ledgers maintained under his direct supervision for direct and indirect costs of the glass matting manufactured during the period October 1960 through March 1961, during which the importations at bar were produced (R. 101). Plaintiffs' exhibit 11 shows the quantity in pounds of glass rods and glass fibrous matting produced and used by his company during the same period. The costs shown in exhibits 10 and 11 were transferred to exhibit 6, which consists of a schedule of manufacturing costs for the merchandise. Such overhead costs were converted onto exhibits 8 and 9 (R. 113).

In our opinion, the testimony in this case, specifically that of the witness Whitefield, and the exhibits in evidence, establish that the glass fibers are the component material of chief value in the imported merchandise. Summarily, Mr. Whitefield testified that plaintiffs' exhibits 6, 7, 8, 9, 10, and 11 represent the cost figures for the total manufacturing process of the imported merchandise from the beginning of the process to the end of the finished product. Specifically, he stated that plaintiffs' exhibit 9 summarizes the total cost of manufacturing the involved glass fiber matting. Further, exhibit 9 indicates that the cost

of the glass raw materials and the conversion costs for fabricating the glass rods and the glass fiber matting from the glass rods, all of which factors are relevant in the determination of the component materials of chief value in the imported matting, exceed in value any other items of cost in the production of the mats. Accordingly, the exhibits in question establish that the matting at bar is in chief value of the glass filaments, and, therefore, properly dutiable under paragraph 230(d) of the Tariff Act of 1930, as modified, at the rate of 21 per centum as manufactures wholly or in chief value of glass, not specially provided for, as claimed, and we so hold.

Plaintiff's alternative claim that the imported matting should be held dutiable under paragraph 1402 of the Tariff Act of 1930, as modified, as roofing felt, is without merit. It is well settled that merchandise is dutiable in its condition as imported. *Hecht Pearl Co. (Inc.)* v. *United States*, 18 CCPA 171, T.D. 44375 (1930). The record discloses that after importation, the fiber glass mat is run through a coating machine where it is coated with asphalt, then coated with a talc-like material to prevent sticking, and wound up in saleable rolls of 540 square feet (R. 13). While the imported merchandise may be used ultimately to be applied to roofs, it is not so used in its imported condition without having been first processed into a roofing felt (R. 17–18). In its condition as imported, the merchandise consists merely of material to be made into roofing felt and is not roofing felt. Accordingly, plaintiff's claim as such cannot be supported.

For the reasons stated aforesaid, the claim in these protests for classification under paragraph 230(d) of the Tariff Act of 1930, as modified, as manufactures wholly or in chief value of glass, n.s.p.f., is sustained. As to all other claims, the protests are overruled.

Judgment will issue accordingly.